ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB - 3 2004
U.S. COURT OF FEDERAL CLAIMS

LAW ENGINEERING AND ENVIRONMENTAL SERVICES, INC.

Plaintiff,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Defendant.

No. 04-0145C

Judge: ____________

## VERIFIED COMPLAINT

COMES NOW Plaintiff, Law Engineering and Environmental Services, Inc., a MACTEC Company ("LAW"), through its undersigned counsel, and files this Complaint against the U. S. Department of Housing and Urban Development ("HUD"), and respectfully states to this Honorable Court as follows:

### Nature of the Action

1. This is an action for relief under the Contract Disputes Act, 41 U.S.C. § 609 and the Tucker Act, 28 U.S.C. § 1491.

2. This action seeks the review of the deemed denial of a Request for Equitable Adjustment and Contracting Officer's Final Decision (the "REA") concerning Contract Nos. C-OPC-21874, 21913, 21914, and 21915 submitted by LAW to HUD on or about June 2, 2003.

## Jurisdiction

3. This Court has original jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491.

## Parties and Factual Background

4. Plaintiff LAW is one of the largest specialty engineering and consulting organizations in the United States. In 2002, the parent company of LAW merged with MACTEC, Inc., thereby expanding LAW's personnel resources, geographic coverage, and technical capabilities.

5. Defendant is the U. S. Department of Housing and Urban Development. One of the areas in which LAW provides services is in evaluating properties concerning hazardous materials such as lead-based paint ("LBP").

6. On or about January 18, 2001, LAW entered into identical Contracts C-OPC-21874, 21913, 21914, and 21915 (the "Contracts") with HUD to perform various services for the Real Estate Assessment Center ("REAC"), a division of HUD.

7. The Contracts stated at section C-1, subsection 1.1:

> The purpose of this contract is to provide the Department, Housing Agencies, and property owners and managers with information to help them manage and control lead-based paint hazards efficiently and effectively, with particular attention to the requirements of the rule on federally-owned and assisted housing (23 C.F.R. 35).

8. Under the Contracts, LAW was to evaluate various HUD-insured or HUD-assisted housing properties to evaluate them for LBP, including property inspection (for

sampled dwelling units, common areas, and exteriors), risk assessment, and laboratory testing. See Contracts, Section C-1, subsection 1.1.

9. The value of each of the Contracts was for a minimum of $100,000, with a maximum of $30,000,000. See Contracts -- Standard Form 26. Each contract consisted of one (1) base year and two (2) options years.

10. During performance of the Contracts, LAW experienced additional, delayed, or disrupted work required or caused by HUD, REAC, or the various property owner/agents ("O/As"), and properly notified HUD as required by the Changes clause in the Contracts. Although on notice of LAW's concerns, HUD took no remedial action.

11. Consequently, on or about June 2, 2003, LAW submitted its REA to HUD. The REA consisted of one 3-inch, 3-ring binder with the REA and supporting documentation. The work covered under the REA was performed from January 18, 2001 through December 12, 2002, and concerned Task Orders 1 through 4.

12. In addition to raising the issues under appeal, the REA noted that, at the time of submission of the REA, LAW had received no additional task orders for a prolonged period of time. LAW advised that its field-evaluation workforce had not had any work to perform for HUD for over 240 days and that LAW had absorbed the continuing costs associated with maintaining the licenses and certifications for these individuals, which would be required to be in place if HUD required further work from LAW. Because of the cost of maintaining these individuals, and the fact that it appeared HUD would not be giving LAW additional work, LAW requested that HUD either clarify whether it intended to issue additional task orders to LAW or terminate the Contracts for convenience.

13. By letter dated July 17, 2003, HUD asked several questions concerning the REA. HUD also stated that a DCAA audit had been requested concerning the REA, and that the Contracting Officer ("C.O.") hoped to issue a final decision within 45 days after the audit was completed.

14. On or about July 24, 2003, LAW was informed that on July 16, 2003 HUD had exercised the option to extend the term of the Contracts for an additional year.

15. LAW responded to HUD's July 17, 2003 letter by its letter dated August 29, 2003. LAW also provided additional supporting documentation to HUD.

16. Upon information and belief, the DCAA auditor assigned to review the REA completed her task in October 2003. However, no audit report has been provided to LAW.

17. Since October 2003, LAW has continually offered to meet with HUD to discuss the REA, and has repeatedly contacted HUD to inquire as to the status of the claim. HUD, however, failed to respond to LAW's letters, emails, and phone calls.

18. By letter dated January 9, 2004, LAW stated that, due to HUD's consistent failure to respond, LAW would consider the REA to have been deemed denied and initiate an appeal by the end of the month.

19. When no response was received from HUD, LAW initiated this appeal.

20. Despite the exercise of both the first and second options to extend the term of the Contracts for an additional year, on June 28, 2002 and July 16, 2003, respectively, no task orders have been issued by HUD since April 18, 2002 (a period in excess of 640 days), and LAW has received no indication from HUD that further work will be forthcoming. Indeed, HUD has entered into other contracts to perform the work. However, as LAW advised HUD in the REA, LAW must incur continuing expense with respect to its field

evaluation workforce so long as there is the possibility that LAW could be required to perform additional work by HUD.

## Appeal Issues

## O/A-Caused Schedule Delay and Disruption

21. Paragraph 4.3.6. of the Contracts required that the property owner/agent (O/A) must provide a continuous escort while the contractor (LAW) was on-site. This was the only method by which LAW could gain access to property dwelling units to perform LBP evaluations.

22. LAW complied with this requirement by sending each O/A a certified letter which advised the O/A of the need for a continuous site escort for the duration of the evaluation. This requirement was also communicated by HUD to the O/A in writing as a requirement for participation by the site in the HUD-funded LBP Evaluation Program.

23. However, LAW experienced daily site work delays and disruption from the inception of the project fieldwork due to the lack of, or disruption to the presence of, the required O/A site escort. Typical occurrences included: no escort at the start of the work day, escort (usually maintenance person) being called away to perform other duties, escort taking extended lunch or other breaks, escort leaving the site prior to the end of a normal business day, or LAW arriving at the site, but being refused an escort.

24. The lack of escort significantly impacted LAW due to increased site evaluation duration (increased costs for labor, expenses, flights, hotels, meals, and auto rental); schedule delays/changes; HUD imposed contract penalties due to LAW's failure to

meet the planned schedule; business disruption such as delays to start/stop data collection and entry; and increased project management/logistics/overhead.

25. HUD/REAC were well aware of the numerous and consistent site delays encountered by LAW due to the O/As, because of notifications by LAW and the fact that these issues were consistently raised at contract meetings between LAW and HUD/REAC.

26. However, during contract performance, HUD/REAC failed to rectify the O/A disruption problems and, indeed, refused to give extensions of time to LAW to compensate it for the numerous delays and disruption. Furthermore, HUD/REAC not only refused to alter the scheduled evaluations, but also imposed financial penalties on LAW if it failed to complete an evaluation within the scheduled time, even when O/A-caused delays were encountered.

27. During the pre-bid conference regarding the procurement for the Contracts, the C.O. was directly asked if there would be compensation to the contractor for site delays; more specifically, whether the contractor would be compensated for a delay of two (2) or three (3) hours while on-site because the presence of the O/A's escort was disrupted. The C.O. directly replied that such site delays would be considered "Unsuccessful Evaluations", as defined under the Contracts and would be compensated accordingly (see RFP Amendment No. 2, pages 73-74).

28. As set forth in the Contracts, when LAW experienced delays and disruption, (i.e., Unsuccessful Evaluation costs) it submitted notice of same to HUD and requested that the issue be addressed, to no avail.

29. The C.O. also agreed that LAW should be compensated for site delays. Specifically, the C.O. agreed that LAW should be compensated for site delays at a January

15, 2002 meeting, which is reflected in the meeting minutes. The C.O. stated, and meeting minutes reflect, that a Contract Modification would be implemented allowing for contractor compensation for O/A-caused site delays.

30. Nonetheless, HUD refused to consider such delays as Unsuccessful Evaluations or to otherwise compensate LAW for the delays and disruption caused by the O/As as discussed in the January 15, 2002 meeting.

31. HUD's refusal to consider such delays as Unsuccessful Evaluations or to otherwise compensate LAW for the delays and disruption caused by the O/As is unreasonable, improper, arbitrary and capricious, and a breach of contract.

32. LAW has requested an equitable adjustment for all direct costs associated with site delays and disruption (labor, expenses, overhead, travel, etc.) that were caused by the failure of O/As to provide escorts in the amount of $134,471.

## Inappropriate Imposition of Contract Penalties

33. Technical Exhibit 4 of the Contracts, "Performance Work Statement Requirements Summary", provides for financial penalties for not meeting the Government's Acceptable Quality Level ("AQL").

34. Penalties assessed by HUD against LAW under this provision for Task Orders 1, 2, 3, and 4 totaled $367,369.05.

35. Of the $367,369.05 assessed, LAW accepts $58,591.28 as being valid. This sum primarily represents penalties associated with the late delivery of reports for Task Orders 1 and 2. However, LAW submits that the remaining $308,777.77 represents the assessment of improper and illegal penalties.

36. The HUD-assessed penalties for not meeting scheduled events should be refunded to LAW, since the basis for such deductions was, in fact, the failure of O/As to provide prompt and/or continuous escorts.

37. Other assessed penalties were simply erroneous. For example, HUD assessed penalties in some cases (such as REMS 800003471 - Mohican Hotel Apartments) where LAW confirmed, five (5) days prior to the start, the actual start date in writing. This was in conformance with the C. O.'s direction as stated during a January 15, 2002 meeting and as later contained in Contract Modification No. 3, Section C-4, subsection 4.3.7. In other cases, HUD penalized LAW where a notice of continuation was issued as a courtesy administrative update and had no material effect on the performance of the field work (as with REMS 800003620 - Veteran's Terrace Property).

38. Furthermore, HUD/REAC did not impose fair and/or reasonable liquidated damages, but instead arbitrarily implemented penalties far in excess of the intent of the Contracts. For example, three (3) properties (REMS 800015928 - Syracuse Apartments, REMS 800018486 - Hands #1, and REMS 800018487 - Hands #2) were assessed five (5) 10% schedule-change deductions each for a total penalty of 50% of the fees associated with each of these three (3) property evaluations.

39. LAW has requested an equitable adjustment for this item in the amount of $308,778.

**Failure to Define Acceptable Quality Level for Evaluation Requirements/Impracticability**

40. Technical Exhibit 4 of the Contracts states that the Acceptable Quality Level (AQL) for field evaluations was "TBD" (to be determined).

41. In designing its testing procedures and reporting guidelines, and establishing the fixed Unit Rate pricing associated with such work, LAW utilized industry standard of care and HUD's Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, June 1995, as amended in 1997 (the "HUD Guidelines"). To demonstrate its testing and reporting procedures, and as required under the Contracts, LAW developed and submitted to HUD a project-specific Quality Control ("QC") Manual.

42. Despite repeated requests by LAW, HUD failed to define the AQL, and, indeed, has not done so as of this date.

43. The failure of HUD to issue AQL guidelines enabled REAC to constantly and arbitrarily reject LAW's reports. REAC has, instead, imposed an unreasonable standard of perfection.

44. HUD and REAC have unreasonably demanded performance that far exceeds industry standards and HUD Guidelines. For example, HUD/REAC have taken the position that one (1) missed reading out of 8000 (the average number of LBP readings taken per property site) is "below the AQL." Also, HUD/REAC have repeatedly directed that, prior to technical acceptance (and subsequent payment) of a property LBP evaluation and report, LAW must return to the site to take less than five (5) LBP readings and/or dust wipes on locations that have already been designated as positive (containing LBP). These "missed" readings would have no material affect on the results of the property's LBP evaluation.

45. HUD/REAC's requirements are far above, and even ignore, industry standards and HUD Guidelines, and, thus, are unreasonable, arbitrary and capricious, and constitute a constructive change.

46. Moreover, HUD/REAC's unreasonable requirements have negatively impacted LAW. Specifically, HUD/REAC unreasonably required LAW to re-submit reports over and over until the evaluation methods and/or reports demonstrated the arbitrary level of perfection HUD/REAC imposed.

47. LAW has requested an equitable adjustment of $1,015,955, which represents the cost of one resubmission of each report.[1]

**Increased Number of Reports**

48. The Contracts require that the contractor produce electronic and paper LBP evaluation reports for each property tested.

49. Chapter 7 of the HUD Guidelines (as revised 1997) and standard industry practice require that a contractor sub-divide a given property into potential "stages" for the purpose of LBP hazards evaluation based on the various buildings or units comprising a property having been built at different times, with differing designs, different builders and potentially different construction materials, as well as stages of a property which are non-contiguous and located in differing geographic locations. When this occurs, a contractor produces a LBP evaluation report for each stage of the multi-stage property. Hence, for

---

1 LAW has assumed responsibility for a portion of the report resubmissions. In truth, LAW averaged approximately 2.5 submissions per report due to HUD/REAC's direction and implementation of its non-contractual AQL. LAW acknowledges that a portion of the report re-submittals were due to errors on its part. Therefore the claim amount covers only one re-submittal per report.

example, a property with three (3) different stages of construction of multiple buildings would receive three (3) LBP Evaluation Reports (one for each property stage) versus a single report.

50. LAW developed its bid and unit pricing based on information supplied by HUD. All property information supplied by HUD indicated that all properties were single stage (i.e., homogenous) properties thereby requiring one (1) LBP evaluation report per property. HUD-supplied information illustrated the number of properties and the sample size of units to be tested per property. These sample sizes were calculated from Chapter 7 of the HUD Guidelines and indicated that all properties were single stage properties.

51. In actuality, LAW discovered later that the Real Estate Management System ("REMS") mortgage number utilized by HUD to list a "property" often included multiple properties bundled under a single REMS number. Indeed, based on HUD's REMS numbers, the properties issued in Task Orders 1, 2, 3, and 4 have averaged 2.9 stages per property. This 290% increase resulted in LAW having to generate numerous additional LBP reports which were not represented in the RFP, considered in the bid process, or reflected in LAW's per unit price. This constitutes a constructive change.

52. Specifically, 312 single-stage properties were represented in the HUD data for Task Orders 1, 2, 3 and 4, which would equate to 312 individual reports. However, LAW discovered during its performance that these 312 properties contained 907 stages. This 290% increase raised the deliverable requirement for LAW to 907 individual reports, since each stage required a separate report for owner information and corrective action.

53. Based on the Government-supplied data, LAW set its fixed-unit price of approximately $1,690.78 per report. Due to smaller unit count per report due to multi-staged

properties, the actual revenue received from HUD, amounted to $662.86 per report. LAW therefore experienced un-reimbursed costs of $1,027.92 per report concerning 907 stage reports, or a total of $932,323.

54. Thus, LAW has requested an equitable adjustment for this item in the amount of $932,323.

**Extra Work Regarding Data Bulk Copy Process**

55. Subsequent to contract award, HUD/REAC indicated its desire to receive portions of the LAW field-collected data via an electronically-transferred Bulk Copy Process ("BCP"). HUD requested, and LAW provided, a proposal dated June 6, 2001, in the amount of $111,440, for these additional services. Avery D. Becton, Contract Specialist, on behalf of the Contracting Officer, issued verbal authorization to proceed to LAW in June 2001.

56. Thereafter, as consideration to HUD as part of a Cure Notice, LAW agreed to provide the BCP proposed scope at no charge. This was formally documented in LAW's Cure Notice Response dated September 28, 2001 and incorporated by HUD into Contracts Modification No. 2 dated September 28, 2001 and signed by the Contracting Officer on February 7, 2002. LAW proceeded to execute the BCP design and demonstrated successful data transfer on schedule on October 22, 2001.

57. However, subsequent to the demonstration of the successful BCP transfer, REAC directed LAW to make a number of software and data manipulations that were beyond the scope of Modification No. 2.

58. By emails dated April 9, 2002, LAW stated that REAC's requests were beyond the scope of the work agreed to in Modification No. 2 and required a change-order

with an appropriate price adjustment. HUD/REAC refused all such requests, demanded additional changes, and, on July 20, 2002, issued unilateral Contract Modification No. 3 mandating that the BCP, including the additional changes, be a pre-requisite for payment to LAW for evaluations. This action constitutes a constructive change.

59. LAW has successfully completed the BCP transfer of all required data for Task Orders 1, 2, 3 and 4.

60. The work required by HUD exceeded the scope of work agreed to in Modification No. 2. Therefore, LAW is entitled to recover its costs for extra work performed.

61. LAW has requested an equitable adjustment for the extra work related to BCP in the amount of $43,557.

**Extra Work, Delay and Disruption Resulting from HUD Caused Inefficiencies**

62. Throughout the course of LAW's performance of the Contracts, HUD was unresponsive and negligent, and HUD's actions (or lack thereof) adversely impacted LAW, causing delays, disruption, and additional work and constitutes a constructive change.

63. For example, due to the unreasonable quality standard to which LAW's field professionals were being held, LAW had to increase its annual program training hours from forty (40) hours per person/per year to in excess of 120 hours per person/per year. Due to HUD's unresponsiveness and mismanagement, LAW sustained an estimated average of eight (8) team hours of lost time per stage (a total of 907 stages for Task Orders 1 through 4), or $1,426,522.

64. Due to HUD's inaccurate and incomplete Task Order Data Base, LAW was forced to expend two (2) additional man-hours per stage in attempts to accurately research the ownership and composition of each stage of each property. This additional work increased LAW's costs by $89,766.

65. The Contracts stipulate that HUD will periodically audit LAW's documentation, at which point such records are to be made available for contract-specified "random review." However, HUD subsequently required that LAW make available full and complete supporting documentation for each property. This requirement caused LAW to expend two (2) man hours per stage to collect, format, review, transmit, and rebut HUD's proposed imposition of penalties. As part of this tasking, LAW incurred additional expenses in the amount of $129,116.

66. HUD has also inappropriately mandated that LAW replace three (3) of its personnel who were acting as Contract Manager with no contractual basis for those mandates. These unilateral directives have caused LAW to incur the direct labor burden of one of its Senior Vice Presidents ("SVP") in excess of two (2) years, increasing its costs by $394,800.

67. Specifically, Mr. James Justus was LAW's original Contract Manager until the Government Technical Representative requested that he be replaced. In the summer of 2001, Mr. Richard Garrison, Senior Vice President and LAW's Executive in Charge of the project, assumed direct contract management responsibilities.

68. By February of 2002, LAW introduced Mr. Joseph Myers as the third Contract Manager, because the GTR and Program Manager from HUD requested a personnel change. The substitution of Mr. Myers as Contract Manager was acknowledged

and accepted by HUD as evidenced in numerous project correspondence documentation. Subsequently, however, in approximately July 2002, the Procurement Contracting Officer ("PCO") requested a copy of Mr. Myers' résumé and subsequently rejected him as the Contract Manager. LAW responded to the PCO's unilateral directive, illustrating that the criteria by which Mr. Myers was rejected had no contractual basis. This response from LAW was rejected by the PCO. Consequently, LAW has had to maintain full time involvement of its SVP, since HUD had refused to acknowledge anyone else as having any authority to communicate with HUD.

69. LAW incurred the following damage due to HUD's actions or inactions discussed above:

| | |
|---|---|
| • Lost time per stage (907 stages) | $1,426,522 |
| • Time to research ownership/composition of each stage | $ 89,766 |
| • Time for response to monthly penalty assessments | $ 129,116 |
| • Management Time (Mr. Garrison) | $ 394,800 |
| TOTAL: | $ 2,040,204 |

70. Since LAW was required to perform extra work and incur additional expense due to HUD/REAC's various improper or unreasonable actions and/or inactions, and breach of contract, it is entitled to compensation for this impact.

71. LAW has requested an equitable adjustment for this item in the amount of $2,040,204.

**COUNT I**
**O/A-Caused Schedule Delay and Disruption**

72. LAW realleges and incorporates herein the allegations contained within paragraphs 1-71 as set forth above.

73. LAW experienced daily site work delays and disruption from the inception of the project fieldwork due to lack of, or disruption to, the required O/A site escort. LAW incurred additional expense due to the O/A-caused delays and disruption.

74. HUD's failure to compensate LAW for the O/A-caused delays and disruption under the Unsuccessful Evaluations clause of the Contracts is unreasonable, improper and a breach of the Contracts.

75. In addition, HUD's failure to permit schedule extensions when the schedule was impacted by the O/A-caused delays and disruption is unreasonable and improper.

76. LAW should be compensated in the amount of $134,471 for the direct harm incurred due to the failure of O/As to provide escorts.

**COUNT II**
**Inappropriate Imposition of Contract Penalties**

77. LAW realleges and incorporates herein the allegations contained within paragraphs 1-76 as set forth above

78. HUD assessed many financial penalties over the course of performance of the Contracts.

79. The imposition of the majority of these penalties was unreasonable, improper, arbitrary and capricious, and a breach of the Contracts.

80. The imposition of $308,778 as penalties against LAW was improper, and LAW should be compensated in the amount of $308,778.

**COUNT III**
**Failure to Define Acceptable Quality Level for Evaluation**
**Requirements/Impracticability**

81. LAW realleges and incorporates herein the allegations contained within paragraphs 1-80 as set forth above

82. Although it was contractually obligated to define the AQL, HUD failed and/or refused to do so throughout the course of performance of the Contracts.

83. HUD's failure to define the AQL was unreasonable, improper, arbitrary and capricious, and constitutes a constructive change and a breach of the Contracts.

84. In addition, since no AQL was ever defined, HUD/REAC has unreasonably demanded performance far in excess of industry standards and HUD Guidelines. HUD's unreasonable demand for perfection rendered performance of the Contracts impracticable.

85. LAW was damaged by HUD's failure to define the AQL and its unreasonable demand for perfection in its evaluations and reports in the amount of $1,015,955, and LAW should be compensated in the amount of $1,015,955.

**COUNT IV**
**Increased Number of Reports**

86. LAW realleges and incorporates herein the allegations contained within paragraphs 1-85 as set forth above.

87. HUD-supplied information regarding the number of properties and the sample size of units to be tested per property (which was the basis for the number of reports)

was highly erroneous, i.e., instead of 312 reports, 907 were actually required. The information supplied by HUD was negligently prepared and HUD failed to correct it despite superior knowledge of the faulty nature of the information. This action constitutes a constructive change.

88. The erroneous information supplied by HUD was used to formulate LAW's pricing. Due to reliance on the erroneous, HUD-supplied data to formulate its pricing, LAW experienced un-reimbursed costs of $1,027.92 per report.

89. LAW was damaged by HUD's negligently-prepared information, and LAW should be compensated in the amount of $932,323.

## COUNT V
## Extra Work Regarding Data Bulk Copy Process

90. LAW realleges and incorporates herein the allegations contained within paragraphs 1-89 as set forth above.

91. HUD required LAW to provide data bulk copy process work in addition to the agreed-to scope of work of Modification No. 2. The requirement of the additional work constitutes a constructive change.

92. HUD accepted the additional work, but has not compensated LAW for the additional work.

93. LAW should be compensated in the amount of $43,557 for the additional work required by HUD.

**COUNT VI**

**Extra Work, Delay and Disruption Resulting from HUD Caused Inefficiencies**

94. LAW realleges and incorporates herein the allegations contained within paragraphs 1-93 as set forth above.

95. Throughout performance of the Contracts, HUD was unresponsive and negligent, and HUD's actions (or lack thereof) impacted LAW, causing delays, disruption, and additional work, and constitute a constructive change.

96. HUD's actions and/or inactions were improper, arbitrary and capricious, and constituted a breach of the duty to act in good faith and a breach of the Contracts.

97. LAW was damaged by HUD's improper actions and/or inactions. LAW should be compensated in the amount of $2,040,204 for the additional work, delays and disruption caused by HUD.

WHEREFORE, LAW prays this Court enter judgment in its favor and against HUD as follows:

a. Granting LAW's appeal of the denial of LAW's claim;

b. Finding for LAW with respect to the aggregate $4,410,972 amount requested in its claim;

c. Granting LAW interest under the Contract Disputes Act from the date the C.O. received the REA on June 6, 2003; and

d. Granting such further relief as the Court may deem just and proper.

Respectfully submitted,

Michael A. Hordell
PEPPER HAMILTON LLP
600 14th Street, N.W., Suite 500
Washington, DC 20005-2004
Telephone: (202) 220-1200
Facsimile: (202) 220-1665
Attorney for Law Engineering and
Environmental Services, Inc.

Of Counsel:
Charles H. Carpenter
Laura L. Hoffman
Jennifer W. Persico

Dated: February 3, 2004

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAW ENGINEERING AND ENVIRONMENTAL SERVICES, INC.<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT<br><br>Defendant. | ) | No. __________<br>Judge: __________ |

**VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct. Executed on February 2, 2004.

Richard P. Garrison
Richard P. Garrison
Senior Vice President
MACTEC Engineering & Consulting, Inc.

DC: #272383 v1 (5%6701!.DOC)